# Illinois Official Reports

## Appellate Court

---

### *People v. Othman*, 2020 IL App (1st) 150823-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ABED OTHMAN, Defendant-Appellant. |
| District & No. | First District, Second Division No. 1-15-0823 |
| Filed | April 7, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-15822; the Hon. Diane G. Cannon, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Chan Woo Yoon, of State Appellate Defender's Office, of Chicago, for appellant. |
| | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, John E. Nowak, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justice Walker concurred in the judgment and opinion.
Justice Coghlan specially concurred, with opinion.[*] |

**OPINION**

¶ 1    In 2008, Motassem Said (Said) was murdered. In a jury trial his nephew, Abed Othman (Othman), was found guilty of the murder. Othman was 17 years old at the time of the crime. The trial court sentenced Othman to 30 years in prison for first degree murder, plus a 25-year weapons enhancement. Othman will be 76 when he is released.

¶ 2    On appeal, Othman contends (1) that the evidence did not prove him guilty beyond a reasonable doubt, (2) that (a) the trial court committed error by allowing hearsay testimony that Othman possessed a gun two years after the murder and (b) the trial court erred when it instructed the jury that Othman's gun possession two years after the crime could be considered only for the purpose of intent, (3) that Othman was denied a fair trial when, in direct violation of the trial court's express ruling, the prosecutor stated during closing argument that the reason Othman did not admit to the shooting during a conversation with a visitor who was wearing a wire was because Othman knew the visiting area of the prison was bugged, (4) that the trial court erred in the manner in which it conducted an inquiry of the prospective jurors under *People v. Zehr*, 103 Ill. 2d 472 (1984), (5) that trial counsel provided ineffective assistance of counsel by failing to object to (a) the hearsay testimony of Said's girlfriend, Janice Lloyd (Lloyd), that "friends in the neighborhood" told her that Othman shot the victim and (b) the prosecutor's comments in closing that Eliya Mansour could not record a confession because Othman was worried that the visitor area of the prison was bugged, (6) that Othman's 55-year sentence is a *de facto* life sentence and is unconstitutional when imposed for a crime committed when Othman was 17, and (7) that Othman is entitled to a new sentencing hearing under section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)) because the firearm enhancement is procedural and therefore retroactively applied to cases on direct appeal.

¶ 3    On March 12, 2019, we entered an opinion reversing and remanding the case for a new trial. We found that Othman received an unfair trial based on the cumulative effect of prejudicial testimony, erroneous jury instruction, admission of hearsay testimony, ineffective assistance of counsel, and the trial court's failure to conduct proper *Zehr* questioning. We also found that Othman's sentence was an unconstitutional *de facto* life sentence.

¶ 4    The State and Othman filed a joint motion for a supervisory order. The joint motion reflected that the parties reached an agreement in which (1) Othman would acquiesce in the State's request for a supervisory order, stating that the sentencing issues were moot as applied to Othman, and (2) the State would not dispute this court's findings on the trial issues.

---

[*]On Justice Mason's retirement, Justice Coghlan was substituted on the panel. Justice Coghlan has listened to the recording of oral argument and has reviewed the briefs and the State's petition for rehearing.

¶ 5     On January 9, 2020, the Illinois Supreme Court issued a supervisory order in *People v. Othman*, No. 125580 (Ill. Jan. 9, 2020) in which the court granted the parties' joint motion and instructed this court to remove the portions of our order that ruled on the constitutionality of Othman's sentence. Pursuant to that supervisory order, we vacated our previous opinion and our decision.

¶ 6                                            I. BACKGROUND

¶ 7     On April 29, 2008, police officers found Said dead from three gunshot wounds to his head, in a parking lot near 63rd Street and Spaulding Avenue in Chicago. The victim lived in the basement of the building at 3257 W. 63rd Street, Chicago. Othman's uncle, Hamdi, owned and operated a bakery in the area. Sergeant John Foster (Foster) of the Chicago Police Department interviewed people in the area late that afternoon. Margaret Biggs (Biggs) told Foster she heard some loud pops, but she had no other useful information. After more than a month of searching, Foster found and interviewed Janice Lloyd, Said's girlfriend.

¶ 8     Four years later, in August 2012, police charged Said's nephew, Othman, with murdering Said. Othman filed a motion *in limine* to bar the prosecution from presenting evidence that in 2010, two years after Said's murder, Othman asked a woman to carry his gun in her purse. The prosecutor explained that he intended to present the testimony to bolster the credibility of a jailhouse informant, who claimed that Othman told him he killed a man in 2008, in the vicinity of 63rd Street and Spaulding Avenue. The informant told police Othman also said that in 2010 he asked his girlfriend to carry a gun for him. The court denied the motion *in limine* and said, "I'll give a *limine* instruction to the jurors that they are not to consider that for incorrect purposes."

¶ 9     The trial court, in an attempt to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), which codified *Zehr*, said to the venire:

> "[T]he defendant is presumed innocent of the charges against him. The State has the burden of proving him guilty beyond a reasonable doubt. Is there anybody who disagrees or could not follow that proposition of law?
>
> No response.
>
> The State has the burden of proving him guilty. He does not have any burden upon himself to prove himself innocent. Do you understand?
>
> Everyone indicates yes.
>
> Is there anyone who does not believe in that principle of law?
>
> No response.
>
> *** Is there anybody in the jury box who would hold it against him if he exercised his right not to testify?
>
> No response."

¶ 10    Defense counsel did not object.

¶ 11    At trial, Lloyd testified that on April 28, 2008, the day before Said died, Othman came to the apartment Lloyd shared with Said. Othman showed Lloyd that he had a gun. Othman and Said went to buy alcohol and marijuana that the three of them shared. Othman also bought crack cocaine for Said "to sell to make some money." Both Lloyd and Said were addicted to crack. Later that day, Lloyd and Said used the crack. Lloyd gave $80 to Said to pay for the drugs. Lloyd testified that Othman "got mad that [Lloyd] gave [Said] the money," and Othman

wanted more money from Said. Lloyd left while Othman and Said argued. She returned and spent the night with Said. She testified that Said did not leave the apartment between the time they went to sleep and the following morning, when Othman woke them up.

¶ 12    Lloyd testified that when she woke up on April 29, 2008, around 10 a.m., she tried to wake Said, but he did not get up. They stayed in bed. Othman came into the apartment and woke them around 11 a.m., pointing the gun at them and demanding money. Lloyd said, "Don't point that gun at me." Othman said to her, "Well, you better get out of here." Said went upstairs to another apartment and got "[a]bout eight dollars" from a neighbor. Said gave the cash to Othman, who said, "What's this s***? You owe me 40 dollars. What's this s***? I want my money." Lloyd then left. She made a phone call "to get some money." She admitted that "every morning [she] wake[s] up, [she would] try to get some money to get crack." She did not contact police. She testified that when Othman pointed the gun at her, she "wasn't afraid. [She] had no reason to be afraid."

¶ 13    The prosecutor elicited the following testimony:

"Q. Did you find out later that day that something happened to [Said]?

A. Yes.

Q. What did you find out?

A. That [Othman] had shot him.

Q. How did you find out?

A. Friends told me in the neighborhood."

¶ 14    Defense counsel did not object.

¶ 15    Mohammed Alkhatabeh (Alkhatabeh), testified that he lived in the same building as Said, that Said lived in the basement, and that around 7 a.m. on April 29, 2008, he saw Said outside, near 63rd Street and Spaulding Avenue. Around noon, Alkhatabeh was walking up the stairs to his apartment and passed Othman, who was walking down the rear stairs in the building, carrying a black garbage bag. Although Othman did not live in the area, Alkhatabeh saw him frequently, often with Said. Alkhatabeh testified that, usually, Othman greeted Alkhatabeh, but on April 29, Alkhatabeh "said 'hello' to him and he just kept going." According to Alkhatabeh, Othman "didn't appear natural, not the same." A few minutes later, Alkhatabeh found out from his neighbor, Hamdi, that Said had died.

¶ 16    A neighbor, Margaret Biggs, testified that around 10:30 a.m. on April 29, 2008, she heard a sound like firecrackers going "Pop, pop, pop."

¶ 17    Foster testified that when he interviewed Biggs in 2008, she told him she heard four loud pops, not three, at approximately noon.

¶ 18    Foster testified that he found only men's clothing, no women's clothing, in the apartment Lloyd said she shared with Said. He testified that he saw shell casings outside the apartment but did not find any expended shell casings inside the apartment. When Foster finally found and interviewed Lloyd in June 2008, Lloyd did not tell him that Othman had a gun. She never said that Othman bought crack for Said to sell. Although Lloyd told Foster that she had smoked marijuana with Said and Othman on April 28, she did not mention the use of crack.

¶ 19    Forensic Investigator William Moore (Moore) testified that he went to an alley at 3245 W. 63rd Street, Chicago, and found two expended .25-caliber cartridge casings, but did not find a firearm at the scene.

¶ 20   Forensic specialist Fred Tomasek (Tomasek) testified that he examined the two .25-caliber casings and determined that their class characteristics were similar and that they had been fired from the same gun.

¶ 21   No weapon was submitted in connection with this case. No physical evidence linking Othman to the weapon used in the shooting was offered.

¶ 22   Beatriz Herrera (Herrera) testified that Othman was her boyfriend in 2010, and she lived with him for four weeks. At that time, two years after the murder, Othman owned a gun. Othman told Herrera to put the gun in her purse. She testified that their friend, Matthew Fernandez (Fernandez), drove Othman and Herrera to a pawn shop, but Othman decided not to pawn the gun. Othman went to jail for burglary later in 2010.

¶ 23   Fernandez testified that Othman came to Fernandez's home on April 29, 2008, and asked to stay overnight. Othman told Fernandez that he had gotten into a struggle with his uncle, and when his uncle tried to grab Othman's gun, the gun fired, killing his uncle. Fernandez did not let Othman spend the night. Fernandez admitted that in 2010 he had a brief sexual relationship with Herrera. Fernandez told Herrera she "shouldn't be with" Othman. He testified that he never drove Herrera and Othman to a pawn shop. Fernandez did not tell police about either conversation until police questioned him in 2011.

¶ 24   Eliya Mansour (Mansour) testified that he met Othman in Cook County jail in 2010. Mansour testified he had two forgery convictions. In 2010, prosecutors jailed him on a charge of felony theft. Mansour befriended Othman while they were both at Cook County jail, and between July 24, 2010, and October 9, 2010, they often spoke together in Arabic. Mansour testified that, in one conversation, Othman said, "Did you ever see a human brain coming from the back of a head?" Othman told Mansour that "a couple years before" 2010, in "Crown Town," "he shot somebody in the head three times and seen his brain coming out." The area called Crown Town includes 63rd Street and Spaulding Avenue.

¶ 25   According to Mansour, Othman told him that after he shot the victim, he took the victim's wallet, which held $50, put the gun in a wall, walked to the YMCA, urinated on his hands to remove the gun powder residue, and later retrieved the gun and found it somewhat rusted. Mansour did not indicate that Othman told him when, between the time of the crime in 2008 and their discussion in 2010, Othman retrieved the gun. Mansour said that Othman told him that he sold the gun to a friend. Mansour also said that Othman told him about his girlfriend, Herrera, and said he once asked Herrera to carry a gun.

¶ 26   In August and September 2010, Mansour wrote to a police officer, telling the officer that he wanted special consideration in exchange for information he could provide about a murder. Prosecutors agreed to reduce Mansour's theft charge to a misdemeanor, and the court sentenced him to supervision on that charge. The State gave Mansour more than $2000 for relocation and other expenses, $200 for residential living assistance, $150 for emergency living expenses, $20 to pay a check cashing fee, $150 for moving expenses, $550 for the first month's rent, and $1100 to pay the security deposit. He received supervision on a plea agreement on a theft by deception charge, which was reduced to a misdemeanor on November 20, 2011. After Mansour finished serving his time in jail, he went to visit Othman in prison while wearing a wire. Othman did not discuss the 2008 shooting, but he mentioned that a court sentenced Othman's cousin Rasheed to 15 years in prison for a shooting. In total, Mansour received $2170 from the state's attorney and generous consideration on a pending felony charge.

Mansour admitted that, in addition to Othman, he was also trying to befriend and then "snitch" on two other inmates while incarcerated at Cook County jail.

¶ 27 Detective Dale Potter (Potter) testified that in February 2010, Othman was a suspect but had not been arrested. In late 2010, Potter heard from the state's attorney's office that a person named Eliya Mansour claimed to have information about Said's homicide.

¶ 28 Dr. Steven Cina (Cina), the chief Cook County Medical Examiner, testified that there were three gunshot wounds to Said's head, that three small-caliber, jacketed bullets were recovered from inside the victim's head, that the cause of death was multiple gunshot wounds, and that the manner of death was homicide.

¶ 29 The prosecution presented investigator John O'Connell (O'Connell) in an effort to bolster Mansour's credibility. O'Connell checked weather records and found that about three-fourths of an inch of rain fell at Midway Airport on May 2, 2008, just three days after the fatal shooting. The prosecutor argued that the evidence corroborated Mansour's testimony that Othman said when he retrieved the gun he left in a wall, he found it rusted. O'Connell found a YMCA building less than two blocks from the crime scene. O'Connell also confirmed that Othman's cousin Rasheed was serving a sentence for a shooting.

¶ 30 The defense presented no evidence or testimony.

¶ 31 In closing argument, the prosecutor noted that Biggs testified that she heard three pops around 10:30 a.m. The prosecutor then said Biggs "told the detectives that she heard these four pops at about noon. *** So we have the shooting being about noon." Defense counsel did not object, even though no witness testified to hearing any gunshots around noon, the only testimony about gunshots put them at 10:30 a.m. Instead, the prosecutor used Biggs's statement to police as the basis for her argument that the shooting took place at noon. Although no evidence supported the assertion that the shooting took place at noon, the prosecutor improperly invited the jury to treat its impeachment of Biggs as substantive evidence that the shooting took place at noon. The prosecutor never attempted to qualify Biggs's statement to Foster as a prior inconsistent statement admissible as substantive evidence. See 725 ILCS 5/115-10.1 (West 2014).

¶ 32 The jury found Othman guilty of first degree murder committed by personally discharging a firearm.

¶ 33 In his motion for a new trial, Othman argued that the court committed reversible error when it denied his motion to bar evidence that, two years after the murder, Othman possessed a gun which, even in the State's theory, played no part in the fatal shooting. The trial court denied the motion for a new trial.

¶ 34 At sentencing, the court chastised Othman:

> "You joined [the street gang] when you were 16 years old. According to you, you terminated that four years ago. Unfortunately, by that time what you could become as a man was already set in stone, sir."

The court sentenced Othman to 30 years in prison for first degree murder, plus 25 years for using a firearm, resulting in a total sentence of 55 years. Othman appeals.

¶ 35                                  II. ANALYSIS

¶ 36                        A. Sufficiency of the Evidence

¶ 37        Othman argues that the State did not prove him guilty beyond a reasonable doubt. No physical evidence connected Othman to the murder. No eyewitness claimed to have seen the shooting. No one saw Othman in the parking lot where the shooting occurred. Alkhatabeh saw Othman in the building around noon, which was not unusual since Othman's relative owned a restaurant in the building. Alkhatabeh said he often saw Othman in the area, so his presence has little evidentiary value. Biggs testified that she heard shots around 10:30 a.m. Othman's presence in the neighborhood two hours after the shooting suggests he felt no immediate need to leave the area. The State impeached Biggs about the time of the shooting, but presented no witness who heard shots around noon. The State's case rested almost entirely on three witnesses who admitted they knew nothing directly about the shooting. The victim, Said, was a crack user and dealer who could be expected to deal with other crack users and dealers in his area who might be expected to be armed and violent.

¶ 38        Lloyd, admittedly addicted to crack, testified that Othman brought a gun to the home she shared with Said in 2008. Othman quarreled with Said about the purchase of crack for resale. When she spoke with police a month after the shooting, she did not mention the gun or the crack. She also testified that Said slept through the night of April 28-29, not waking until 11 a.m.; however, Alkhatabeh testified he saw Said in the neighborhood at 7 a.m. on April 29. Lloyd also said she lived in the apartment with Said, but Foster found only men's clothing, no women's clothing, in the apartment.

¶ 39        Fernandez testified that, on April 29, Othman came to his home and confessed to having struggled with his uncle, during which time a gun went off and killed Said. Fernandez did not contact police to tell them about the confession. Fernandez admitted that he had a sexual relationship with Herrera and advised her that she "shouldn't be with" Othman.

¶ 40        Mansour admitted that he contacted police to let them know he had information about a murder and that he traded that information for favorable treatment. He negotiated a plea to a misdemeanor on a felony charge, obtained a sentence of supervision, and received more than $2000 from the State, even though he failed to induce Othman to confess when Mansour wore the wire. Part of Mansour's account conflicts with Lloyd's testimony. According to Lloyd, Said went to borrow money from neighbors and used it to pay Othman. But according to Mansour, Othman said Said had $50 in his wallet when Othman shot him.

¶ 41        Thus, the conviction rests on the impeached, conflicting testimonies of a jailhouse informant, a man who tried to separate Othman from Othman's girlfriend, and a crack addict who did not tell police about the gun or the crack when police interviewed her a month after the death of the man with whom she lived. "[W]hen it appears that a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it an absolute conviction of its truth." *People v. Williams*, 65 Ill. 2d 258, 267 (1976). "A witness can be impeached with prior silence where it is shown that the witness had the opportunity to make [a] *** statement and, under the circumstances, a person normally would have made the statement." *People v. Wallace*, 331 Ill. App. 3d 822, 828 (2002). "[T]he fact a witness is a *** narcotics addict has an important bearing on his credibility." *People v. Huffman*, 177 Ill. App. 3d 713, 723 (1988). The jury must assess the credibility and the weight of testimony. *People v. Romero*, 384 Ill. App. 3d 125, 132 (2008). However, we find this jury received evidence that should not have been admitted. Therefore, we find that the sufficiency of the evidence is

questionable as discussed *infra*.

¶ 42                              B. Testimony About the 2010 Gun

¶ 43    Othman contends that the trial court committed error when it permitted the State to present evidence that in 2010, two years after the murder, Othman possessed a gun unrelated to the murder and asked his girlfriend to carry it in her purse.

¶ 44    The State argued that Othman's 2010 possession of the gun corroborated Mansour's testimony. The trial court held that Othman's possession of a gun in 2010 provided admissible evidence of his intent in 2008. The State relied on Mansour's testimony that Othman told him he sold the fatal gun in 2008, and therefore the gun he possessed in 2010 was not the gun used to fire the fatal bullets. But "evidence of other crimes is not admissible to bolster the credibility of a prosecution witness." *People v. Thingvold*, 145 Ill. 2d 441, 459 (1991). In this case, as in *People v. Jackson*, 154 Ill. App. 3d 241, 246 (1987), the gun about which Herrera testified "was not involved in the crime. [Citations.] The potential for prejudicial inferences to be drawn from such a weapon in evidence far exceeds any legitimate purpose identified by the State in the present case and must be condemned."

¶ 45    If Herrera's testimony about the 2010 gun had not been admitted, the jury would have had a more reasonable opportunity to question Mansour's motives and credibility. When hearing about the 2010 gun from both Herrera and Mansour, the jury could reasonably believe that Othman did confess to Mansour and that Mansour truthfully recalled the confession. The jury was led to believe that Othman possessed a gun at two different times in the past. There was never any descriptive information that might have shown that the 2008 and the 2010 guns were the same; the only reason the State wanted this information admitted into evidence was to corroborate what Mansour said and, through that, to connect Othman to the actual shooting.

¶ 46    Allowing Herrera's testimony about a gun she saw in Othman's possession two years after the crime—with no other testimony about its description, size, or caliber—cannot support the trial court's decision to allow this testimony. During oral argument, the State argued:

>        "With regard to the other crimes evidence, again it's our position that the State introduced that not to corroborate the prosecution witness [Mansour], but to show that Othman did in fact confess and that that confession was real and reliable."

¶ 47    At trial, the State argued exactly the opposite when the prosecutor specifically called attention to Herrera's testimony about the 2010 gun and how it corroborated Mansour's testimony about what Othman told him. Herrera's testimony about the gun was highly prejudicial. Othman argues that the court committed error when it admitted into evidence irrelevant and highly prejudicial evidence of gun possession, in a case with closely balanced evidence.

¶ 48    We review the trial court's evidentiary ruling for abuse of discretion. *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 24. The test is whether the decision to allow the evidence is arbitrary, fanciful, or unreasonable or whether no reasonable person would take the trial court's view. *People v. Morgan*, 197 Ill. 2d 404, 455-56 (2001). Here, the court allowed evidence that was not related to the crime charged in any possible way. The gun that Herrera said she saw in 2010 was not the gun used in 2008. We find that the trial court committed error when it allowed Herrera to testify about the 2010 gun.

C. Illinois Pattern Jury Instructions, Criminal, No. 3.14

¶ 50    Moreover, the trial court committed error when it gave the jury instruction pursuant to Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.14), and limited its consideration of the gun in Othman's possession in 2010 to a question of intent only.

¶ 51    IPI Criminal 4th No. 3.14 states:

> "[1] Evidence has been received that the defendant[s] [ (has) (have) ] been involved in [(an offense) (offenses) (conduct)] other than [(that) (those)] charged in the [(indictment) (information) (complaint)].
>
> [2] This evidence has been received on the issue[s] of the [(defendant's) (defendants')] [(identification) (presence) (intent) (motive) (design) (knowledge) (_____)] and may be considered by you only for that limited purpose.
>
> [3] It is for you to determine [whether the defendant[s] [(was) (were)] involved in [(that) (those)] [(offense) (offenses) (conduct)] and, if so,] what weight should be given to this evidence on the issue[s] of _____." IPI Criminal 4th No. 3.14.

The Committee Notes state: "The Illinois Supreme Court has made clear that evidence of other crimes is admissible if it is relevant to establish any fact material to the case other than propensity to commit crime." IPI Criminal 4th No. 3.14, Committee Note. See *People v. Stewart*, 105 Ill. 2d 22, 62 (1984).

¶ 52    The State acknowledged at oral argument that the instruction was wrong:

> "With regard to the IPI, we do recognize that the intent was a misstatement, that it was not offered on any point of intent."

The court told the jury to use this information for intent only. The jurors heard Lloyd say that Othman came over with a gun and threatened her and Said with it in 2008. They heard Herrera say Othman had a gun in 2010. A reasonable jury, given that instruction, could make a reasonable decision that if Othman had a gun in 2008, and again in 2010, he must have intended to use it.

¶ 53    But the State was not done. In oral argument, the State offered this explanation:

> "But if you read the instruction as a whole, you look at it that it did alert the jury to the fact that they were to use that evidence not to show propensity. But it was only to be a limited way to view the evidence. At one point the court was trying to insure that the jury would not consider it for anything other than what we had introduced it. It was not to be considered for propensity that this person is a badperson. *** Did it cause confusion? It may have caused confusion, but when you read it as a whole, it did not violate Othman's rights because it did not tell the jury that they couldn't consider it that Othman is a bad guy with a propensity to commit other crimes."

¶ 54    This explanation seems to acknowledge that the jury *could* consider the possession of a gun in 2010 as evidence of Othman's propensity to commit other crimes—exactly what the court's instruction ("only for intent") told the jury not to do.

¶ 55    The State suggests that Herrera's testimony about the gun proves that Mansour was telling the truth that Othman confessed to him because Othman allegedly talked about the 2010 gun and Herrera talked about the 2010 gun. The State insists that the Herrera testimony about that gun was not to prove that the confession to the murder described by Mansour was true, but that Mansour truthfully relayed what Othman said. This suggestion is not complete, especially

when you consider that Mansour was cutting a deal for himself and had plenty of time to get briefed on a story line between the time he asked for his deal and the time of the trial. Mansour was essential to the State because he connected Othman to the crime, when nothing else did. But Mansour was a jailhouse informant, convicted of previous felonies, searching out gullible Arabic-speaking inmates. His goal was to rack up enough information to get his deal, and it worked. However, that does not mean that the jury was not confused about what that 2010 gun meant.

¶ 56     This issue was preserved where defense counsel filed a motion *in limine* to prevent the testimony about the 2010 gun, objected to it at trial, and included it in the posttrial motion.

¶ 57     We find that the court committed error when it gave the jury instruction, IPI Criminal 4th No. 3.14, as a limiting instruction for intent only with respect to Herrara's testimony. The instruction was highly confusing and prejudicial.

¶ 58                           D. Prosecutor Violated Court's Ruling

¶ 59     Othman argues that he was denied a fair trial when, in closing argument, the State commented on its interpretation of Mansour's belief that he failed to obtain a taped confession out of Othman because Othman knew the prison visitor room was bugged.

¶ 60     This issue was not preserved for appellate review; since it is unnecessary for our ultimate determination, we will not address it.

¶ 61                           E. "*Zehr* Principles"—Rule 431(b)

¶ 62     The State admits that the trial court erred when it failed to ask the venire members the eight questions required under *Zehr*:

> "Now with regard to the *Zehr* issue, we acknowledge it was wrong and sometimes you are at a loss. Judges might have all those things there, and we wish she would read of them, but in this case the Judge did tap on a couple of those *Zehr*, but she did not say it and we acknowledge it."

¶ 63     In criminal trials, Illinois judges are required to ask the venire eight simple questions: (1) defendant is presumed innocent: (a) do you understand that? (b) do you accept it?; (2) defendant is not required to offer any evidence on his own behalf: (a) do you understand that? (b) do you accept it?; (3) defendant must be proved guilty beyond a reasonable doubt by the State: (a) do you understand that? (b) do you accept it?; and (4) the failure of defendant to testify on his own behalf cannot be held against him: (a) do you understand that? (b) do you accept it? Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 64     The court failed to properly read the eight questions. The court stated,

> "[t]he Defendant is presumed innocent of the charges against him. The State has the burden of proving him guilty beyond a reasonable doubt. Is there anybody who disagrees or could not follow that proposition? No response. The State has the burden of proving him guilty. He does not have any burden upon himself to prove himself innocent. Do you understand? Everyone indicates yes. Is there anyone who does not believe in that principle of law? No response. *** Is there anybody in the jury box who would hold it against him if he exercised his right not to testify? No response."

¶ 65     Here, the court conflated the first and third principles: (1) Othman is presumed innocent and (3) the State has to prove him guilty beyond a reasonable doubt. The court did not ask if

the venire understood the first principle that Othman is presumed innocent. It did ask if the venire understood the second principle that Othman is not required to present any evidence on his own behalf, but failed to ask if the venire accepted that principle.

¶ 66    The court did correctly cover the third principle—that the jury both understood and accepted that the State must prove Othman guilty beyond a reasonable doubt. However, the court did not ask if the jury understood the fourth principle—that Othman's failure to testify on his own behalf cannot be held against him.

¶ 67    The *Zehr* court itself was emphatic on the necessity of asking the eight questions:

> "We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect. *** We agree *** that '[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' [citation] ***." *Zehr*, 103 Ill. 2d at 477.

¶ 68    The court failed to ask if the jury understood principles one and four or if it accepted principle two. That is three out of eight questions, or 37.5% error rate. When a defendant's liberty interest is at stake, asking all eight questions is not an unreasonable burden, even on a seasoned and busy judge. Furthermore, by failing to ask jurors if they understood the cornerstone principles of Othman's right to a just and unbiased jury, the court failed to give any juror the chance to admit that he or she did not understand the principle, so it could be cleared up or so the juror could be dismissed. Whether or not a single juror understands both the words and the implication of the principles is foundational to justice.

¶ 69    Othman admits that his counsel did not object to the trial court's questions. Othman asks us to address the issue as plain error. Where the errors in evidence admitted produced a false impression of the facts, and there is ineffective assistance of counsel, this case possibly could have had a different result. When we look at whether a case is closely balanced, the tendency is to look at the same information the jury had to decide. But there is another, important consideration: What if we look at what the jury did not have, but should have had, and/or what the jury did have, but should not have had? The analysis becomes much broader when the errors of the court and ineffective assistance of counsel are also considered. The State argues that this case is not closely balanced because Othman presented no evidence.

¶ 70    Othman has a constitutional right not to present evidence and not testify. The evidence can be closely balanced where the evidence comes from unreliable witnesses who offer conflicting accounts or from prosecution witnesses who provide evidence favorable to Othman. Even when the defense presents no evidence, the case can still be closely balanced. Our supreme court has ruled on this issue in *Piatkowski*:

> "As to whether the evidence is nevertheless closely balanced, we begin by noting that defendant presented no alibi and no evidence whatsoever other than the testimony of Detective Sobolewski. But that is not fatal to his argument. Although defendant has the burden before this court to show that the evidence is closely balanced, he had no burden to present any evidence or to testify himself at trial." *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007).

- 11 -

In this case, we find that the quantum of admissible evidence presented by the State against Othman rendered the evidence closely balanced. Where Othman has shown that the evidence was closely balanced, "prejudice is not presumed; rather, '[t]he error is actually prejudicial.' " *People v. Sebby*, 2017 IL 119445, ¶ 51 (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)).

¶ 71                                    F. Ineffective Assistance of Counsel

¶ 72        It is well established that every person charged with a crime has a constitutional right to receive effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 685 (1984). The right to effective assistance of counsel entails "reasonable, not perfect, representation." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. To prevail on a claim of ineffective assistance of trial counsel, Othman must satisfy the two-prong test set forth in *Strickland* and establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced Othman. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Baines*, 399 Ill. App. 3d 881, 887 (2010). With respect to the first prong, Othman must overcome the "strong presumption" that counsel's action or inaction was the result of sound trial strategy. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001); *People v. Shelton*, 401 Ill. App. 3d 564, 583-84 (2010). " 'In recognition of the variety of factors that go into any determination of trial strategy, *** claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review.' " *Wilborn*, 2011 IL App (1st) 092802, ¶ 79 (quoting *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002)). To satisfy the second prong, Othman must establish that but for counsel's unprofessional errors, there is a reasonable probability that the trial court proceeding would have been different. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002). A reviewing court must consider the attorney's overall performance when determining whether counsel's conduct prejudiced Othman. *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984); *In re Denzel W.*, 237 Ill. 2d 285, 299 (2010); *People v. Roper*, 116 Ill. App. 3d 821, 825-26 (1983). A defendant must satisfy both the performance and prejudice prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim. *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008).

¶ 73        Othman argues that his counsel provided ineffective assistance by failing to object to the prosecutor's deliberate elicitation of highly prejudicial hearsay that Lloyd found out, from friends in the neighborhood, that Othman killed Said.

¶ 74        The parties do not contest the applicable principles.

> "To establish a claim of ineffective assistance of trial counsel, [Othman] must show that his attorney's performance was deficient and that he suffered prejudice as a result, *i.e.*, there was a reasonable probability that but for counsel's deficient performance, the result of the proceedings would have been different. [Citation.] The decision whether to object to the admission of evidence is generally a strategic one that may not form the basis of a claim of ineffective assistance of counsel. [Citation.]" *People v. Smith*, 2014 IL App (1st) 103436, ¶ 63.

"The constitutional guarantee of effective assistance of counsel requires a criminal defense attorney to use the applicable rules of evidence to shield his client from a trial based upon unreliable evidence." *People v. Fillyaw*, 409 Ill. App. 3d 302, 315 (2011).

¶ 75     The State used Lloyd's testimony that she heard from friends in the neighborhood that Othman killed Said. Defense counsel did not object, thereby allowing the State to inject prejudicial hearsay that some other witnesses would also testify that Othman committed the crime. This set of mysterious, anonymous witnesses could not be cross-examined, nor could their credibility be considered by the jury.The jury could easily have believed that there were other, actual witnesses who implicated Othman, which could have been a significant factor in the jury's determination that Othman was guilty.

¶ 76     Admitting the Lloyd hearsay, with no objection from counsel, denied Othman his basic right to challenge the State's case. It cannot be viewed as a strategic decision under any reasonable circumstance and was prejudicial. We find that Othman received ineffective assistance of counsel when counsel did not object to Lloyd's hearsay statement.

¶ 77     The cumulative effect of the prejudicial Herrera testimony—layered on the erroneous and highly confusing jury instruction, the admission of the Lloyd hearsay testimony, the ineffective assistance of counsel, and the problematic *Zehr* questioning—resulted in an unfair trial. We remand for a new trial.

¶ 78                              III. CONCLUSION

¶ 79     Because of the cumulative effect of the court's errors and the ineffective assistance of counsel, we reverse and remand.

¶ 80     Furthermore, during Othman's sentencing hearing, the circuit court referenced Othman's decisions as a juvenile and his prior gang affiliation. The judge stated that Othman's character was "set in stone" when, in his youth, he joined a gang, while the judge knew that Othman had left the gang. We find these comments deeply troubling. We conclude that the interests of justice are best and most efficiently served by assigning this case to a different judge on remand. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) grants a reviewing court, in its discretion, the power to reassign a matter to a new judge on remand. *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002); *People v. Tally*, 2014 IL App (5th) 120349, ¶ 43; see also *People v. Serrano*, 2016 IL App (1st) 133493 (remanding the case to be presided over by a different judge to avoid prejudicing the defendant); *People v. McAfee*, 332 Ill. App. 3d 1091, 1097 (2002) (finding that remand to a different judge for a new sentencing hearing was warranted "in order to remove any suggestion of unfairness"). Accordingly, we are remanding this case to the presiding judge of the criminal division of the circuit court for reassignment to a different judge for a new trial consistent with this opinion.

¶ 81     Reversed and remanded with directions.

¶ 82     JUSTICE COGHLAN, specially concurring:

¶ 83     Based on the supreme court's order allowing the parties' joint motion for a supervisory order, I concur in the result only.