2022 IL App (1st) 200638-U

FIFTH DIVISION
SEPTEMBER 23, 2022

No. 1-20-0638

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 3271 |
| | ) | |
| TERRELL WASHINGTON, | ) | Honorable |
| | ) | William B. Raines, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the defendant's conviction for attempted first degree murder where the trial court did not plainly err by considering inadmissible hearsay evidence.

¶ 2    Following a bench trial, the defendant-appellant, Terrell Washington, was convicted of attempted first degree murder (720 ILCS 5/8-4(a) (West 2018), 720 ILCS 5/9-1(a)(1) (West Supp. 2017)) and sentenced to 21 years' imprisonment. On appeal, he argues this court should reverse his conviction and remand for a new trial because, in finding the victim's identification testimony

credible, the trial court committed plain error by considering inadmissible hearsay evidence. The defendant contends that the trial court erroneously considered: (1) police records that indicated his nickname was "Krupt" and; (2) an officer's statement in body-worn camera footage. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4     The defendant was charged by indictment with five counts of attempted first degree murder (counts I-V) and one count of aggravated battery (count VI) for shooting Erika Chambliss. Relevant to this appeal is count I, which alleged that the defendant shot Ms. Chambliss without lawful justification and with intent to kill, and count VI which alleged that, in committing a battery, he knowingly discharged a firearm and injured Ms. Chambliss.

¶ 5     At trial, Ms. Chambliss identified the defendant in open court and testified as follows. The defendant was nicknamed "Krupt." At about 9:14 p.m. on January 18, 2018, the defendant visited Ms. Chambliss' apartment. They sat in a rear room near the kitchen and smoked cigarettes. They discussed Ms. Chambliss' girlfriend and the defendant repeatedly told Ms. Chambliss to lower her voice. However, she did not. At some point, the defendant drew an automatic weapon from his waistband and shot at Ms. Chambliss, while saying "I knew you were going to do it. I knew you were going to put me out."

¶ 6     Ms. Chambliss ran towards the front of the apartment, and the defendant fired multiple shots without pausing. Ms. Chambliss was shot in her elbow and calf. The defendant then ran out the front door. A neighbor found Ms. Chambliss on her couch and called an ambulance. Paramedics transported her to the hospital.

¶ 7 When Ms. Chambliss was released from the hospital, she told police officers that "Krupt" shot her. She identified the defendant in a photo array on January 19, 2018, and stated she was "120 percent sure" that the man in the photograph shot her.

¶ 8 On January 23, 2018, someone knocked on Ms. Chambliss' door very hard. The peephole was covered, but she assumed it was the defendant and called 911. The police arrived and escorted her to a police vehicle. From the vehicle, she saw the police escort someone out of the building. She told the police officers that it was the person who shot her. The police detained the person and later identified him as Will Coleman. Ms. Chambliss then told them that Mr. Coleman was not the shooter. She claimed that Mr. Coleman was an "associate" whom she had known for a few years. She later identified a photo of Mr. Coleman as the man who was detained outside her apartment. She again said that he did not shoot her. She identified a photo of the defendant as "Krupt," the man who shot her.

¶ 9 On cross-examination, Ms. Chambliss testified that she entertained friends in her smoke room, and occasionally let people spend the night and leave clothes at her apartment. She denied using the smoke room for the street drug "leaf," and further denied that, on January 18, 2018, she was consuming marijuana, leaf, or alcohol. Ms. Chambliss said she had a "clear mind" when the police and paramedics arrived after the shooting but did not know she had been shot in the leg until the paramedics noticed the wound. She denied stating she did not want to go to the hospital, smelling of alcohol, or telling an officer that the shooter was named "Tariq" and was about 5'6" tall and weighed 230 pounds.

¶ 10 Ms. Chambliss explained that, at her building, visitors must be buzzed through an outside gate by a resident. On January 23, 2018, she did not buzz anyone into the premises before hearing

the knock on her door. She denied telling the 911 operator that the man who shot her was outside her door. She then insisted that she identified Mr. Coleman to police as the person who knocked on her door, not as the person who shot her. Mr. Coleman frequented her home but did not keep belongings there.

¶ 11 On redirect examination, Ms. Chambliss testified that the defendant left a green hoodie jacket at her apartment the night of the shooting, which she gave to police. She was nearsighted and supposed to wear glasses. She initially told the police that the person she viewed from the police vehicle on January 23, 2018, *i.e.*, Mr. Coleman, was the person who shot her because she was far away when she looked at him from the police vehicle.

¶ 12 On recross-examination, Ms. Chambliss testified that, while she was still in the police vehicle, the police showed her Mr. Coleman's photograph and she stated that he was not the shooter. She told the police she was nearsighted.

¶ 13 Paramedic Steven Baranowski testified that he responded to Ms. Chambliss' apartment the night of the shooting. Ms. Chambliss was on the couch, "very disoriented," and had been shot in the arm. In the ambulance, the paramedics noticed entry and exit wounds on her leg.

¶ 14 During Mr. Baranowski's testimony, the State published footage from the body camera of a police officer who responded to the scene. The footage is included in the record on appeal and depicts officers arriving at Ms. Chambliss' apartment. The police officer wearing the camera approaches Ms. Chambliss, who is on the couch, and asks for the shooter's name. Ms. Chambliss does not audibly respond to the question but asks for help with her arm. The paramedics ask if she can walk and help her off the couch. The police officer states into her radio that the offender is Ms. Chambliss' boyfriend. The police officer again asks for the shooter's name as Ms. Chambliss

is helped down the stairs. The paramedics ask Ms. Chambliss what is wrong with her legs, tell her to walk, saying "come on, let's go." After they descend the stairs and approach the door, a paramedic asks why Ms. Chambliss is limping and she says her knee hurts. Outside, the police officer again asks for the shooter's name. Ms. Chambliss, slurring, responds with what sounds like "Krupt," then spells "K-U-R-U-P-T." The police officer incorrectly repeats the spelling and states her belief that the shooter is named "Tariq."

¶ 15    Ms. Chambliss repeatedly asks where they are taking her and denies needing hospitalization. Near the ambulance, the police officer asks for the shooter's last name while a paramedic simultaneously asks if Ms. Chambliss has been drinking. She repeatedly denies being intoxicated or knowing the shooter's last name. In the ambulance, she states the shooter is 5'6" tall and weighs 230 pounds. She repeats the shooter's name and its spelling, and says the shooting was about a girl.

¶ 16    On cross-examination, Mr. Baranowski testified that Ms. Chambliss smelled of alcohol and he thought she was inebriated.

¶ 17    Detective Eric Reyes testified that he and a partner met with Ms. Chambliss at the hospital on January 18, 2018. Immediately after they introduced themselves, she said, "I know who shot me," and gave them the nickname "Krupt." The trial court overruled defense counsel's hearsay objection because the testimony was "part of a police investigation."

¶ 18    Detective Reyes then went to Ms. Chambliss' apartment. He observed blood and shell casings in the kitchen. Afterwards, the detectives searched a "data warehouse" for individuals named "Krupt," "took those photographs," and compiled a photo array. Ms. Chambliss viewed the photo array and identified the defendant as the shooter. The police officers recovered a jacket from

Ms. Chambliss' apartment, which she said belonged to the defendant. They then released an investigative alert for the defendant.

¶ 19    On January 23, 2018, Detective Reyes learned that someone had been arrested. Detective Reyes went to the police station, learned that the person arrested was Will Coleman, and released him. On cross-examination, Detective Reyes agreed that he interviewed Mr. Coleman before releasing him.

¶ 20    Chicago police officer Edward Poppish testified that he responded to Ms. Chambliss' apartment on January 23, 2018, after receiving information that Ms. Chambliss had called the police and stated that the person who shot her was outside her door. Officers detained Mr. Coleman outside Ms. Chambliss' apartment. Officer Poppish stood with Mr. Coleman on the sidewalk while Ms. Chambliss viewed Mr. Coleman from inside a police vehicle on the street. Ms. Chambliss identified Mr. Coleman as the shooter.

¶ 21    The State asked Officer Poppish if officers told Ms. Chambliss that it was Mr. Coleman who had been detained. Officer Poppish did not know and, to refresh his memory, the State showed him several minutes of body-camera footage taken by another police officer, referring to it as "Video No. 7." After viewing the video, Officer Poppish stated that he was uncertain of the distance between Mr. Coleman and the police vehicle when Ms. Chambliss identified Mr. Coleman as the shooter.

¶ 22    The State also asked Officer Poppish about a statement made by Officer McKenna near the end of the video. Defense counsel objected to the question as leading, and the trial court sustained the objection. The State then asked him what Ms. Chambliss said in the video about her

relationship with Mr. Coleman. Officer Poppish replied, "[f]rom what it said on the video," Ms. Chambliss stated that Mr. Coleman was her brother and was homeless.

¶ 23    The State then published the last minute of the video for the court, although the court noted that it had "heard most of it" when it was played to refresh Officer Poppish's memory. The video is included in the record on appeal. The last minute of the timeframe, which the State published at trial, depicts a police officer with the name tag "McKenna" approaching the police officer wearing the camera and stating, "She's saying that that's her brother, he's homeless, and supposedly he has her phone."

¶ 24    On redirect examination, the State asked how much time passed after Ms. Chambliss identified Mr. Coleman as the shooter until she "recanted." Defense counsel objected as there had been "no evidence of a recantation." The trial court responded: "Well, there is evidence, from what I heard, that she then identified him as her brother and homeless. So you can ask questions about that, if he considers that a recantation." The State asked how much time passed after Ms. Chambliss identified Mr. Coleman as the shooter until she stated that he was her brother and not the shooter. Defense counsel objected, arguing that there was "no testimony that he's not the shooter." The court sustained the objection, explaining:

>    "What I heard in the video *** is that Officer McKenna walked up and says that Willie Coleman is her brother, he's got her phone, she wants her phone back, there may be some evidence on the phone. I don't recall hearing anything about him not being the shooter in what I heard."

¶ 25    The State asked Officer Poppish how much time passed before someone told him that Mr. Coleman was Ms. Chambliss' brother. The court overruled defense counsel's "double hearsay" objection, and Officer Poppish responded that 7 to 10 minutes had passed.

¶ 26    The State then published another video of body-worn camera footage, "Video No. 11." In the video, which is included in the record on appeal, the police officer wearing the camera is driving a vehicle, another police officer is in the passenger seat, and Ms. Chambliss is in the back seat. The vehicle is parked near Ms. Chambliss' apartment building. The police officers state that a detainee is being brought over for identification and ask Ms. Chambliss if she can see. The passenger-officer exits the vehicle and approaches the gate to Ms. Chambliss' apartment building, which is on the right side of the street. The driver-officer asks if Ms. Chambliss sees the detainee. Ms. Chambliss is silent for a moment, begins to respond affirmatively, and the police officer drives several feet closer to the gate. Ms. Chambliss says, "Yeah, that's him," and "That's Krupt." The officer then reverses away from the gate. Ms. Chambliss states that she does not want any "static" with "his" family. The officer says, "I get it—he shot you, right?" and she responds affirmatively. She confirms she knows him as Krupt.

¶ 27    Several minutes later, the police officer exits the vehicle and returns to the front of the apartment building to speak to other police officers while Ms. Chambliss remains in the vehicle. The police officers stand in the street, and a woman is intermittently visible on the left side of the street, opposite the apartment building. The police officers discuss whether to show Ms. Chambliss the photo in an investigative alert. Officer McKenna approaches, nods his head toward the left side of the street, and states, "She's saying his name is William Coleman." The police officer wearing

the camera asks, "She who?" and Officer McKenna points towards the location of the woman on the left side of the street and answers, "She's supposedly his sister, allegedly."

¶ 28    Officer Poppish further testified that there was a "bulletin" related to the incident which named the defendant and listed his nickname as "Krupt."

¶ 29    The State entered several stipulations, including that three shell casings recovered near the rear door of Ms. Chambliss' kitchen were fired from the same weapon, that an evidence technician photographed bullet holes and suspected blood stains in the kitchen, and that the defendant was a possible donor of the major DNA profile found on a tissue in a pocket of the jacket recovered from Ms. Chambliss' apartment. The expected frequency of the DNA profile was "no more common than approximately 1 in 42 nonillion" individuals. The parties also stipulated to the foundation for a phone call made by the defendant in jail and published a portion of it. The recording is in the record on appeal. In the recording, the defendant and the other person on the line discuss calling "[t]hat b***," and telling her "don't bring her ass to court," or "come and say it wasn't me." The State then rested its case.

¶ 30    Defense counsel moved for a directed finding, arguing that Ms. Chambliss' identification of the defendant as the shooter was incredible given the video evidence showing that she identified Mr. Coleman as the shooter five days later. Defense counsel further argued that the video taken the night of the shooting showed that Ms. Chambliss was disoriented, "high," and "drunk," and Officer Baranowski testified she smelled of alcohol. Counsel also noted that the defendant was "[c]learly" taller and lighter than how Ms. Chambliss described the shooter in the video of her statement. Finally, defense counsel argued that the video reflected that the police believed the

shooter was Ms. Chambliss' boyfriend, but she did not testify that the defendant was her boyfriend. The court denied the motion for a directed finding and the defense rested.

¶ 31    In closing argument, defense counsel incorporated his argument from the motion for a directed finding and further argued that Ms. Chambliss' courtroom demeanor indicated that she abused drugs. He pointed out that she "mumbled," "slumped in her seat," and answered questions illogically. Defense counsel argued that the evidence suggested the police dispatcher on January 23, 2018, received a call from Ms. Chambliss, indicating that she said the shooter was at her door. And the video from that day depicted the officers ensuring that she could see Mr. Coleman from the police car during the show-up. Ms. Chambliss did not testify that Mr. Coleman was her brother, was homeless, or had her phone. Defense counsel also claimed that the jail-call recording was "unintelligible." In sum, defense counsel argued the State did not meet its burden of proof.

¶ 32    Following closing arguments, the trial court found the defendant guilty on all counts but amended the ruling to reflect guilty findings on counts I and VI.[1] The court noted that, on the video taken the night of the shooting, Ms. Chambliss stated, as soon as she could, that "Krupt" shot her. The court explained that while Ms. Chambliss looked intoxicated, she could have been in shock from being shot, and it declined to assume she was on drugs. The trial court also noted that the paramedics gave Ms. Chambliss "a hard time" and asked her multiple questions at once. Yet, she continued to identify the defendant as the shooter throughout the investigation and in court. The trial court stated, "we saw that on video because they were going to show her a picture that they pulled based on the nickname of Krupt to be Terrell Washington." Further, the defendant's DNA

---

[1]On the next court date, the State moved to nol-pros four counts of attempted first degree murder (counts II-V), explaining that they should have been nol-prossed before trial. The court granted the State's motion.

was linked to the jacket that Ms. Chambliss told officers belonged to the defendant. Regarding the video of the show-up, the court explained: "Yes, she identified Willie Coleman as the shooter from the vehicle. And the next thing you know, the police officer walks up and she told that police officer that that's my brother and I want my phone back."

¶ 33    After the trial court rendered its decision, the defendant filed a motion for reconsideration and a new trial. At a hearing on the motion, defense counsel argued that Ms. Chambliss never recanted her identification of Mr. Coleman, but the videos contained "some incidental conversations, which is essentially hearsay." The court clarified that, according to its notes, during Video No. 7, played during Officer Poppish's direct examination, "Officer McKenna approached, and then they asked Ms. Chambliss if Willie Coleman is the shooter, and she said, 'Willie Coleman is my brother and he's homeless.' So that was Officer Poppish's testimony ***." Defense counsel nonetheless noted that, despite the officer's statement, the video did not show Ms. Chambliss recanting her identification of Mr. Coleman. The court acknowledged that and explained its perspective of what the video showed.

¶ 34    The trial court then denied the defendant's motion for reconsideration and a new trial. In doing so, the court emphasized that it found Ms. Chambliss' testimony credible and that her identification of Mr. Coleman "was cleared up when she said that's my brother and he's homeless." The court also noted that Ms. Chambliss testified that she had poor eyesight and needed glasses. The court reiterated that Ms. Chambliss told an officer who responded to the shooting that "Krupt" shot her, which was "a nickname for the defendant." When shown the photo array, Ms. Chambliss made "an immediate identification of the defendant also known as "Krupt."

¶ 35    Following a sentencing hearing, the trial court sentenced the defendant to the minimum term of 21 years' imprisonment for attempted first degree murder (count I), 12 years' imprisonment for aggravated battery (count VI), and merged count VI into count I. The court denied the defendant's motion to reconsider sentence. This appeal followed.

¶ 36                                    ANALYSIS

¶ 1     We note that we have jurisdiction to consider this matter, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 37    On appeal, the defendant argues that two pieces of evidence which were admitted at trial were inadmissible hearsay: (1) the police records which listed his nickname as Krupt; and (2) Officer McKenna's statement in Video No. 7 that "she" said Mr. Coleman was her brother and homeless. The defendant contends that the trial court erred by considering this hearsay evidence in finding him guilty.

¶ 38    The defendant acknowledges that he failed to preserve these issues for appeal by not objecting at trial or raising them in his motion for a new trial. *People v. Reese*, 2017 IL 120011, ¶ 60 ("To preserve an issue for review, a defendant must object at trial and raise the alleged error in a written posttrial motion."). However, he requests plain-error review. The plain-error doctrine allows a reviewing court to address a forfeited claim where a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* The defendant carries the burden of persuasion under either prong. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). The

first step in plain-error analysis is determining whether a clear and obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 39    As the defendant had a bench trial, we will presume that the court considered only competent evidence unless the record affirmatively shows otherwise. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 28. That includes the presumption that the trial court considered evidence only for competent purposes. See, *e.g.*, *People v. Naylor*, 229 Ill. 2d 584, 603 (2008) ("As a matter of law, we must presume that the trial court considered the defendant's prior conviction only with respect to the purpose for which it was competent." (internal quotation marks omitted)).

¶ 40    "Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted." *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23; see also Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay evidence is generally inadmissible, subject to certain exceptions. *Jovan A.*, 2014 IL App (1st) 103835, ¶ 23; see also Ill. R. Evid. 802 (eff. Jan. 1, 2011). However, evidence is not hearsay where it is not offered to prove the truth of the matter asserted—for example, police officers may testify to information they received during an investigation to explain why they took a certain action, so long as that testimony is offered only to show the steps of the investigation. *Jovan A.*, 2014 IL App (1st) 103835, ¶ 23. We review whether a trial court allowed inadmissible hearsay under the abuse of discretion standard. *People v. McNeal*, 405 Ill. App. 3d 647, 666 (2010).

¶ 41    We first consider the defendant's argument that the trial court impermissibly considered testimony that police records listed "Krupt" as his nickname as evidence that he was, in fact, nicknamed Krupt. The State argues that the evidence was offered only to show the course of the investigation, and that the court did not consider it to bolster Ms. Chambliss' identification of the defendant.

¶ 42    After reviewing the record, we find that the court did not abuse its discretion in allowing the State to present this evidence. The evidence presented was that Detective Reyes compiled a photo array that included the defendant, after searching the nickname "Krupt" in the police database. And after Ms. Chambliss identified the defendant in the array, an investigative alert or "bulletin" listing the defendant with that nickname was created. In other words, this evidence was presented to show the investigative process.

¶ 43    At the outset, Ms. Chambliss identified the defendant at trial and stated that his nickname was Krupt. And Detective Reyes testified that Ms. Chambliss told the police officers the shooter's nickname was Krupt. The court overruled the defendant's objection to that testimony, and he does not challenge that ruling on appeal. Detective Reyes confirmed that the police officers searched the nickname in a "data warehouse" and created a photo array from "those photographs" to show Ms. Chambliss. She identified the defendant's photograph as the shooter. The police officers subsequently released an investigative alert for the defendant. Officer Poppish testified there was a "bulletin" naming the defendant and listing his nickname as Krupt. In Video No. 11, which was admitted into evidence, the police officers discussed showing Ms. Chambliss the investigative alert. The trial court noted that action when it found the defendant guilty.

¶ 44    Consequently, the evidence that a search for "Krupt" in police records implicated the defendant was not offered for the truth of the matter asserted—that the defendant was nicknamed Krupt—but rather to show how the officers created the photo array through which Ms. Chambliss identified the defendant as her shooter. See *Jovan A.*, 2014 IL App (1st) 103835, ¶ 23. Accordingly, the trial court did not err in allowing evidence that the police searched the nickname "Krupt" in a

database in order to compile the photo array from which Ms. Chambliss identified the defendant, or subsequently created an investigative alert for the defendant.

¶ 45    In reaching this conclusion, we reject the defendant's argument that the trial court's statements when announcing the verdict and ruling on the defendant's posttrial motion that the defendant was "known as" Krupt show that the court considered the evidence as proof he was nicknamed Krupt. We acknowledge that the court did state that the defendant was "known as" Krupt and that Ms. Chambliss identified a photograph of "the defendant also known as Krupt." However, those statements by the court do not rebut the presumption that it considered the evidence only for its competent purpose of showing the course of the police investigation. Again, Ms. Chambliss testified that the defendant was nicknamed Krupt. The trial court could therefore rely on her testimony to state that the defendant was known as Krupt. The record thus does not affirmatively show that the court erred in considering inadmissible hearsay evidence that the defendant was nicknamed Krupt. *Naylor*, 229 Ill. 2d at 603. Accordingly, as the defendant has not shown the court erred in this regard, he cannot establish plain error.

¶ 46    The defendant next contends that the court erred in considering Officer McKenna's inadmissible hearsay statement in Video No. 7, played during Officer Poppish's direct examination. In that video, Officer McKenna states, "She's saying that that's her brother, he's homeless, and supposedly he has her phone." The defendant characterizes the statement as a retraction by Ms. Chambliss of her identification of Mr. Coleman as the shooter and argues the retraction is inadmissible double hearsay, or hearsay within hearsay. The defendant maintains that the "natural implication" of Officer McKenna's statement is that Ms. Chambliss misidentified Mr.

Coleman as the shooter. The State maintains that the statement was offered to show the course of the police investigation and the court did not consider it as a recantation by Ms. Chambliss.

¶ 47    Section 10-30 of the Law Enforcement Officer-Worn Body Camera Act (Act) (50 ILCS 706/10-1 *et seq.* (West 2018)) provides that body camera recordings "may be used as evidence in any administrative, judicial, legislative, or disciplinary proceeding." 50 ILCS 706/10-30 (West 2018). However, the Act does not except body-worn camera footage from the hearsay rule. *People v. Collins*, 2020 IL App (1st) 181746, ¶¶ 21-26, *modified on denial of reh'g.*[2] Indeed, we ultimately found in *Collins* that certain statements contained in a body camera video were inadmissible hearsay. See *id.* ¶¶ 30-33.

¶ 48    Before we determine whether the court erred here, we must note that Officer Poppish's testimony assumed that, in Video No. 7, Officer McKenna was referring to Ms. Chambliss when he stated that "she" asserted Mr. Coleman was "her" brother. The trial court also expressed this view when ruling on defense counsel's objection to the State asking Officer Poppish how much time passed until Ms. Chambliss "recanted" her identification of Mr. Coleman as the shooter.

¶ 49    However, in Video No. 11, which we have reviewed, the officer wearing the camera stands in the street. The vehicle in which Ms. Chambliss sits is behind him, Ms. Chambliss' apartment is on the right side of the street, and a woman is intermittently visible on the left side of the street. Officer McKenna approaches from the officer's front. He nods towards the left side of the street and states that "she" said the detainee was named William Coleman. When asked to whom he is referring, Officer McKenna points towards the location of the woman *on the street* and says, "She's

---

[2]An appeal in this case is pending before the supreme court. See *People v. Collins*, No. 127584 (Ill. Nov. 24, 2021) (allowing petition for leave to appeal).

supposedly his sister, allegedly." Officer McKenna is never depicted speaking with Ms. Chambliss or walking past the officer towards the vehicle where Ms. Chambliss sits.

¶ 50     Thus, Video No. 11 shows that Officer McKenna referred to the woman on the left side of the street, not Ms. Chambliss, as the person who asserted that Mr. Coleman was her brother. It follows that in the statement from Video No. 7, which is at issue here, Officer McKenna also referred to the woman on the street, *not Ms. Chambliss*. Moreover, Ms. Chambliss testified that Mr. Coleman was her "associate." Accordingly, the matter asserted within Officer McKenna's statement is not that Ms. Chambliss stated Mr. Coleman was her brother. Rather, it is that the woman on the street, visible on the video, stated that Mr. Coleman was her brother.

¶ 51     The record does contain some evidence suggesting that the trial court considered Officer McKenna's statement for the truth of the matter asserted—that Ms. Chambliss said Mr. Coleman was her brother. Ultimately, however, we need not decide whether the trial court erred in considering Officer McKenna's statement as the defendant is unable to show plain error. See *People v. White*, 2011 IL 109689, ¶ 134 (court may conduct plain-error analysis without determining whether error occurred). He asserts only the first prong, that the evidence here was so closely balanced that the error threatened to tip the scales of justice against him. *Reese*, 2017 IL 120011, ¶ 60.

¶ 52     To determine whether the evidence at trial was closely balanced, we undertake a "qualitative, commonsense assessment" of the evidence in its totality and context, including any evidence regarding the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53. An error is prejudicial under the first prong where its impact on the outcome was "potentially dispositive." *Id.* ¶ 68; accord *White*, 2011 IL 109689, ¶ 133 (the defendant must show that the guilty verdict "may have

resulted from the error and not the evidence properly adduced at trial" (internal quotation marks omitted)).

¶ 53    Evidence may be closely balanced where the trier of fact was required to select between two competing, credible versions of events. *Sebby*, 2017 IL 119445, ¶ 63 (citing *Naylor*, 229 Ill. 2d at 606-08 (evidence closely balanced where no extrinsic evidence corroborated or contradicted competing version of events and case turned on credibility contest)). Even when the defendant does not present any evidence, however, the evidence may still be closely balanced if the State's witnesses were unreliable or provided evidence that favored the defendant. *People v. Othman*, 2020 IL App (1st) 150823-B, ¶¶ 69-70 (rejecting State's argument that evidence could not be closely balanced where the defendant did not present evidence) (citing *People v. Piatkowsi*, 225 Ill. 2d 551, 567 (2007))); see also *People v. Effinger*, 2016 IL App (3d) 140203, ¶¶ 12, 26 (evidence not closely balanced under commonsense assessment where the defendant presented no evidence and circumstantial evidence supported victim's version of events).

¶ 54    Here, the defendant did not present any evidence. Thus, the issue is whether "the quantum of admissible evidence presented by the State *** rendered the evidence closely balanced." *Othman*, 2020 IL App (1st) 150823-B, ¶ 70. The defendant argues there is closely-balanced evidence regarding whether Ms. Chambliss was too inebriated to credibly identify her shooter. As already noted, he carries the burden of persuasion. *Lewis*, 234 Ill. 2d at 43.

¶ 55    Ms. Chambliss testified that the defendant, whom she knew by the nickname Krupt, visited her apartment on January 18, 2018. They smoked cigarettes in the rear room of her apartment, near the kitchen. When the defendant requested Ms. Chambliss lower her voice and she did not, he

drew a firearm and shot her multiple times. She ran to the apartment's front. The defendant exited the apartment, leaving his jacket.

¶ 56    Other evidence supports Ms. Chambliss' testimony. The body camera footage of the responding police officer shows Ms. Chambliss spelling her shooter's name "K-U-R-U-P-T" shortly after the shooting. Detective Reyes testified that, when he met Ms. Chambliss at the hospital, she "immediately" stated she knew who shot her and, shortly thereafter, identified the defendant's photograph in the array. Ms. Chambliss testified she was "120 percent sure" that the man in the photograph she identified shot her as she ran from the back room near the kitchen through the apartment. Detective Reyes observed blood in Ms. Chambliss' kitchen, shell casings were recovered near the rear kitchen door, and an evidence technician photographed bullet holes and suspected blood stains in the kitchen, corroborating her testimony that she was shot in the rear of the apartment. The jacket that Ms. Chambliss stated the defendant left at her apartment held a tissue with a DNA profile consistent with the defendant.

¶ 57    The defendant argues the evidence is closely balanced because paramedic Baranowski testified that, when he arrived, Ms. Chambliss smelled of alcohol and he believed she was inebriated. She did not know she had been shot in the leg until the paramedics discovered the wound. The defendant further notes that, in the video from the night of the shooting, Ms. Chambliss appears disoriented and says the shooter is 5'6" tall and weighs 230 pounds while defense counsel noted, without objection in arguing the motion for new trial, that the defendant is taller and lighter.[3] He also points out that, on January 23, 2018, the police officers conducted a show-up with Mr.

---

[3]In his brief on appeal, the defendant directs us to the online records of the Illinois Department of Corrections (IDOC), where he is listed as being 5'11" tall and weighing 178 pounds. See *People v. Johnson*, 2021 IL 125738, ¶ 54 (court may take judicial notice of IDOC's online records).

Coleman outside Ms. Chambliss' apartment and she told them that Mr. Coleman was Krupt and confirmed he shot her.

¶ 58    With regard to her identification of Mr. Coleman as the shooter, Ms. Chambliss explained in court that, after learning it was Mr. Coleman who was detained outside her apartment, she realized that she had misidentified him as her shooter because she was nearsighted, and she then told the officers Mr. Coleman did not shoot her.

¶ 59    Ms. Chambliss identified the defendant in the photo array only a few hours after the shooting and identified him again in open court. She also testified that she retracted her identification of Mr. Coleman as the shooter as soon as she realized her mistake. And it would require belief that it was a coincidence the jacket Ms. Chambliss said the shooter left in her apartment at the time of the shooting, held a tissue with a DNA profile linked to the defendant.

¶ 60    In making a commonsense evaluation of the evidence in its totality and context, Ms. Chambliss' testimony that the defendant shot her is supported by her consistent identification of him as the shooter and his DNA link to the tissue from the jacket left in her apartment after the shooting. See *Sebby*, 2017 IL 119445, ¶ 53. Thus, even if the trial court erroneously considered Officer McKenna's statement in Video No. 7 to mean that Ms. Chambliss stated Mr. Coleman was her brother and not the shooter, the error was harmless. The evidence was not closely balanced such that the error threatened the fairness of his trial. *Lewis*, 234 Ill. 2d at 43. Consequently, the defendant has not carried his burden of establishing that the trial court plainly erred. We therefore affirm the defendant's conviction.

¶ 61                                     CONCLUSION

¶ 62    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 63    Affirmed.